**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JANNETH PEDERSON,** | § | |
| **individually and as representative** | § | |
| **of all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 5:20-cv-00020** |
| | § | |
| **UNILEVER N.V., UNILEVER PLC,** | § | |
| **UNILEVER HOME AND PERSONAL** | § | |
| **CARE, NA, CONOPCO, INC., UNILEVER** | § | |
| **MANUFACTURERA S. DE R.L. DE CV** | § | |
| **(UNILEVER DE MÉXICO), and DOE,** | § | |
| | § | |
| **Defendants** | § | |

---

### FIRST AMENDED CLASS ACTION COMPLAINT

---

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Plaintiff Janneth Pederson ("Pederson"), who on her own behalf and on behalf of others similarly situated, and files this Amended Class Action Complaint against Unilever N.V., Unilever PLC, Unilever Home and Personal Care, NA, Conopco, Inc., Unilever Manufacturera S. de R.L. de CV (Unilever de México), and DOE (collectively, "Unilever" or "Defendants") and would respectfully show the Court as follows:

### CLASS DEFINITION AND CLASS ALLEGATIONS

1. Plaintiff brings this action on behalf of herself and on behalf of all other similarly situated persons as a class action pursuant to Fed.R.Civ.P. 23. The members of the Class are defined as follows:

> All persons, anywhere in the United States or Mexico, who purchased, used, or otherwise acquired Pond's Rejuveness Anti-Wrinkle Cream/Pond's Rejuveness Crema Antiarrugas

---

("Rejuveness"), in or from Mexico, within the last  four  (4)  years  and  who  suffered mercury-related injuries.

2.     As alleged herein, at all material times Unilever manufactured, sold, and advertised its anti-aging beauty products in Mexico, including Rejuveness, that were used by the Plaintiff and found to contain toxic and illegal levels of mercury.  As a result, Pederson and other putative class members were injured by, have suffered, or continue to suffer from mercury toxicity, the hallmark of which devastates the central nervous system.

3.     Although at least three brands of skin cream cosmetic products from Mexico have been published in a Federal Food & Drug Administration Import Alert since 2009,[1] similar skin lightening creams continue to make their way into the United States from Mexico by and through Unilever.

4.     The addition of mercury in cosmetic products is recognized and condemned by a multitude of agencies, both domestic and international.  For example, the World Health Organization ("WHO") has published multiple public flyers denouncing the use of mercury-containing creams.[2]  Although such skin lightening products are manufactured globally, state entities such as the United States, the European Union, Canada, and the Philippines have either banned or placed strict restrictions on mercury concentration levels in cosmetics.  The European Union and the United States have some of the most stringent standards.  The use of any mercury compounds in cosmetics are banned entirely in the European Union,[3] while the United States limits

---

[1] Import Alert 53-18 ("Detention Without Physical Examination of Skin Whitening Creams Containing Mercury"), U.S. FOOD & DRUG ADMINISTRATION (last updated Nov. 13, 2019), available at https://www.accessdata.fda.gov/cms_ia/importalert_137.html (listing Crema Aquamary, Manning Beauty Cream, and Viansilk Skin Crema).

[2] See Mercury in cosmetics and skin lightening products, WORLD HEALTH ORGANIZATION (Nov. 3, 2019), available at https://www.who.int/publications-detail/mercury-in-cosmetics-and-skin-lightening-products.

[3] Mercury-containing cream and soap, WORLD HEALTH ORGANIZATION, INTERNATIONAL PROGRAMME ON CHEMICAL SAFETY (Environmental Health Criteria 118) (1991).

concentration levels to < 1 mg/kg (the equivalent of 0.0001% percent).[4]  In the United States, such negligible levels are only permissible if they are unavoidable under good manufacturing practices.[5]  As of the date of this Complaint, Mexico has no such regulations.

5.      Though the sale of these skin lightening creams, such as mercury-containing Rejuveness, grossly exceeds acceptable standards in the United States, many people continue to bring such products into the United States.  More alarmingly, federal health authorities in Mexico have been on notice for more than two decades that mercury-containing creams are produced in Mexico.  In April 1996, after reports from the Texas Department of Health and the California Department of Health Services, the Mexican Secretary of Health seized 35,000 containers of skin lightening cream in the state of Tamaulipas, Mexico for testing at the National Public Health Laboratory, which confirmed high levels of mercury.[6]  Sadly, the problem persists today and it has permanently damaged unknown numbers of people.

## THE PARTIES

A.      **Plaintiff**

6.      Plaintiff, Janneth Pederson, is a citizen of the State of Texas who resides at 24818 Caliza Terrace, Boerne, Texas 78006.  Pederson has used Rejuveness for its intended purpose over a period of seven years.  Like all putative class members, she used Rejuveness for its cosmetic purposes as recommended on the label.  Pederson had no reason to suspect that a Pond's cosmetic cream could be toxic or life-threatening.  Indeed, the containers included no warnings or other measures reasonably calculated to protect consumers from mercury poisoning.

---

[4] Cosmetics: ingredients prohibited & restricted by FDA regulations, U.S. DEP'T OF HEALTH & HUMAN SERVICES (May 30, 2000).
[5] 21 C.F.R. § 700.13(d)(2)(i).
[6] *See* Morbidity and Mortality Weekly Report (MMWR) 45(19); 400-403, CENTER FOR DISEASE CONTROL & PREVENTION (May 17, 1996), available at https://www.cdc.gov/mmwr/preview/mmwrhtml/00041544.htm.

B.      **Defendants**

7.      Unilever (or "Ponds" occasionally herein) is a multinational corporation with a complex organizational structure.  Defendant Unilever N.V. and Defendant Unilever PLC are the two parent companies of the Unilever Group, headquartered in London, United Kingdom and Rotterdam, Netherlands, respectively.  Unilever Group, its parent companies, and their subsidiaries effectively work as a "single economic entity."[7]  Both Unilever N.V. and Unilever PLC are holding and service companies, and the business activity of Unilever is carried out by subsidiaries around the world.  As foreign defendants, Unilever N.V. and Unilever PLC must be served with process in accordance with international treaty.[8]  As of this date, Pederson has submitted the appropriate applications to the respective foreign central authority to effectuate service on the foreign defendants.  *See* **Exhibit A**, attached hereto.  Pederson does not have an estimate as to how long service of process will take on these foreign entities or whether the COVID-19 pandemic is affecting service times in those countries.

8.      Defendant Unilever Home and Personal Care, NA (hereinafter, "Trumbull R&D Centre") is a Unilever research and development center located in Trumbull, Connecticut.[9]  Pond's is one of the many brands supported at the Trumbull R&D Centre.  In addition to the discovery and application of new technologies that address customer needs and/or improve product functionality, the Trumbull R&D Centre houses the Pond's Institute and Unilever's Packaging Excellence Centre.  Pederson is informed and believes that Trumbull R&D Centre is associated

---

[7] Making Sustainable Living Commonplace: The Governance of Unilever, UNILEVER (Jan. 1, 2019), available at https://www.unilever.com/Images/governance-of-unilever-2019_en2_tcm244-417136_en.pdf.
[8] Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention"), available at
https://www.hcch.net/en/instruments/conventions/full-text/?cid=17 (last accessed Apr. 29, 2020).  The United States, the United Kingdom, and the Netherlands are parties to the Hague Service Convention.
[9] Our R&D Locations: Trumbull, North America, UNILEVER, available at
https://www.unilever.com/about/innovation/our-r-and-d-locations/trumbull-north-america/ (last accessed Apr. 29, 2020).

with Unilever Trumbull Holdings, Inc. and/or Unilever Trumbull Research Services, Inc., both Delaware corporations, which can be served through their registered agent The Corporation Trust Company at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

9.      Defendant Conopco, Inc. (hereinafter, "Conopco") is an entity doing business as Unilever in the personal care products manufacturing industry.   As of December 31, 2019, Conopco is listed as a significant subsidiary of Unilever, according to SEC filings.[10]   Conopco is a for-profit entity incorporated in the state of New York and can be served through its registered agent CT Corporation System at 28 Liberty Street, New York, New York 10005.[11]

10.      Based on information and belief, Defendant Unilever Manufacturera S. de R.L. de CV is the personal care products manufacturing branch of Unilever de México, which are subsidiaries of Unilever N.V. and Unilever PLC.[12]   As a foreign defendant, Unilever Manufacturera S. de R.L. de CV (Unilever de México) must be served with process in accordance with the Hague Service Convention.[13]   Once summons is issued for this defendant, Pederson will submit the appropriate application to the foreign central authority to effectuate service in Mexico.

11.      The Doe defendant is the company which manufactured, distributed, designed, and/or exercised control over the product known as Pond's Rejuveness Anti-Wrinkle Cream/Pond's Rejuveness Crema Antiarrugas ("Rejuveness").   Because of Unilever's complex, multinational corporate structure, it is conceivable that only further discovery will permit Pederson

---

[10] Form 20-F Annual Report for the Fiscal Year Ended December 31, 2019 for Registrant Unilever PLC, available at https://www.sec.gov/Archives/edgar/data/217410/000119312520067343/d836658d20f.htm, p.142, 157, and Form 20-F Annual Report for the Fiscal Year Ended December 31, 2019 for Registrant Unilever N.V., available at https://www.sec.gov/Archives/edgar/data/110390/000119312520067338/d835598d20f.htm, p. 142, 157.
[11] Pederson would show that Conopco, Inc.'s principal place of business is the same as Unilever United States, Inc., located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.   Pederson voluntarily withdrew her claims against Unilever United States (Doc. 11) in reliance on a verified affidavit that the entity was not a proper defendant.
[12] *Supra* n.10, at p. 155.
[13] *Supra* n.8.

to identify the proper designer or manufacturer of Rejuveness.  As such, this Court permitted Pederson to proceed against the unnamed Doe defendant (Doc. 15).

## JURISDICTION & VENUE

12.     This class action is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 and personal jurisdiction pursuant to 28 U.S.C. § 1330.

13.     This Court has personal jurisdiction over Unilever N.V. and Unilever PLC through its continuous and systematic business activities in the United States, such as manufacturing, designing, and distributing Unilever products, including Rejuveness.  *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011); *Goodyear v. Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011).  Service of process is governed by the Hague Convention, discussed above.[14]

14.     This Court has personal jurisdiction over Trumbull R&D Centre by virtue of Texas's long-arm statute.  Tex. Civ. Prac. & Rem. Code §§ 17.041–.045; *see also* 28 U.S.C. § 1330(b).  This statute generally covers situations where an out-of-state corporation or other business entity is "doing business" in Texas.  Under this state's long-arm statute, a "nonresident does business in this state if the nonresident. . . commits a tort in whole or in part in this state[.]" Tex. Civ. Prac. & Rem. Code § 17.042(2).  This Court also has personal jurisdiction over Trumbull R&D Centre because this suit arises out of this Defendant's contacts with Texas.  *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014)).

15.     This Court has personal jurisdiction over Conopco by virtue of the same analysis as detailed above for Defendants Unilever N.V., Unilever PLC, and Trumbull R&D Centre.  While

---

[14] *Supra* n.8.

*Bristol-Myers Squibb* held that a defendant's distribution of a product through independent third parties does not create personal jurisdiction, 137 S. Ct. at 1783, the manufacture and distribution of Rejuveness is controlled by Unilever and its affiliates, keeping it within the chain of Unilever manufacturing and distribution.  Conopco is a significant subsidiary of Unilever.[15]  Additionally, discovery will show that Conopco, Inc. is a "d/b/a" of Unilever that provides personal care products.

16.     This Court has personal jurisdiction over Unilever Manufacturera S. de R.L. de CV, the personal care products manufacturing branch of Unilever de México because (1) the defendant's contacts with Texas are purposeful, and (2) the cause of action arises from those contacts.  *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 795 (Tex. 2005); *see also Bristol-Myers Squibb*, 137 S. Ct. at 1785–86.  "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 ("[T]here must be an affiliation between the forum and the underlying controversy, principally an activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation."); *M & F Worldwide Ccorp. V. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d, 878, 886 (Tex. 2017).

17.     Venue properly lies in the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1391(b).  Defendant, a corporation, is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction.  28 U.S.C. § 1332(c)(2). In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the

---

[15]*Supra* n.10.

state law claims because all of the claims are derived from a common nucleus of operative fact and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

18.     Furthermore, the Plaintiff resides in Kendall County, Texas, within the Western District of Texas, and the acts and omissions alleged herein took place in Kendall County, Texas.

## BACKGROUND INFORMATION

### The Widespread Use of Toxic Mercury in Cosmetics

19.     Mercury is considered highly toxic and readily turns to a vaporous state at room temperature.  Vapor inhalation, in even the most miniscule amounts, is the most dangerous type of mercury exposure.  The most prominent symptoms associated with vapor-induced mercury neurotoxicity include hand tremors, emotional lability and erethism, insomnia, neuromuscular changes, headaches, slowed sensory and motor nerve conduction velocities, memory loss, and cognitive function performance deficits.[16] The effects of mercury poisoning have delated onset and can be permanent.[17]

20.     Despite its well-documented dangers to human health, international cosmetic manufacturers intentionally infuse products with mercury. The WHO is one of many authorities to recognize this practice as a danger to public health.[18]   According to the WHO, cosmetic manufacturers outside the United States and European Union commonly use mercury in cosmetics, such as face creams and moisturizers, due to a belief it can serve as a skin lightening (bleaching) agent.  The United States Food and Drug Administration ("FDA") also recognizes the practice and

---

[16] U.S. ENVIRONMENTAL PROTECTION AGENCY, EPA-452/R-97-007, MERCURY STUDY REPORT TO CONGRESS VOLUME V: HEALTH EFFECTS OF MERCURY AND MERCURY COMPOUNDS (Dec. 1997), at 3-11.
[17] Morbidity and Mortality Weekly Report (MMWR) 68(50); 1166-1167 (Dec. 20, 2019), CENTER FOR DISEASE CONTROL & PREVENTION (Jan. 20, 2012), available at
https://www.cdc.gov/mmwr/volumes/68/wr/mm6850a4.htm?s_cid=mm6850a4_w.
[18] See Mercury in cosmetics and skin lightening products, supra n.2.

sternly rebukes it.  21 C.F.R. § 700.13 (reiterating toxic nature of mercury and criticizing efficacy as skin bleaching agent).

21.     The use mercury in cosmetics such as facial creams[19] is strictly illegal in the European Union and illegal in the United States except for an amount of one part per million (microgram per liter) if and only if it is impossible to manufacture the product without any mercury.  International awareness of the common use of mercury in cosmetics is growing and countries have begun to sign treaties banning such practices.[20]  As of today, however, most other countries do not have such laws and cosmetic manufacturers are exploiting those populations.[21] Mexico is one such country.

22.     Unilever, through its brand Pond's, is a large international cosmetic manufacturer. One of its products in particular has garnered special fame and reputation in Mexico for effectiveness in counteracting the effects of aging skin (such as age spots).  That product is known as "Pond's Rejuveness" and is a moisturizer marketed for daily use.  Pond's sells the same branded product in both the United States and Mexico, but Pond's charges vastly different amounts for what would appear to be the same product.  For example, Ponds sells a 200-gram container of its Rejuveness facial cream for $11.72 on the U.S. version of Amazon.  *See* ASIN B005GLO6GC on Amazon.com, last accessed Dec. 31, 2019. In Mexico, however, Pond's sells a 200-gram product with the same branding for $90.70.  *See* ASIN B005GLO6GC on Amazon.com.mx, last accessed Dec. 31, 2019. The product Pond's sells through the Mexican Amazon site is not available in the

---

[19] Regulatory limits differ for mercury levels in eye area cosmetic products.  The regulatory limit for eye area cosmetic products in the European Union is $\leq 0.007\%$ by weight.  *See* Mercury in cosmetics and skin lightening products, *supra* n.2.  The regulatory limit for eye area cosmetic products in the United States is $\leq 65$ mg/kg.  *See* 21 C.F.R. § 700.13(d)(2)(ii).
[20] Minamata Convention on Mercury, UNITED NATIONS, Oct. 10, 2013, T.I.A.S. No. 17-816 (signed by the U.S. on Nov. 6, 2013 and entered into force on Aug. 16, 2017).
[21] *See* Mercury in cosmetics and skin lightening products, *supra* n.2.

United States.  When a consumer tries to purchase it and have it delivered to the United States, Pond's will not do so.

***Mercury in Facial Creams is Common, Highly Dangerous***

23.      As the WHO and FDA report, facial creams produced outside the United States commonly contain mercury for its dubious skin bleaching attributes. Those products do not, however, provide any disclosure to consumers they contain a known toxin capable of causing severe neurological damage and reproductive harm.

24.      Sadly, areas of the United States which border Mexico have seen numerous cases of mercury poisoning disproportionately higher than other parts of the United States.  Those cases are typically not publicized but some are known to authorities such as the United States Department of Health and Human Services Centers for Disease Control and Prevention (the "CDC").

25.      The CDC issues weekly epidemiological digests for the United States, which publish public health information and recommendations received by the CDC from state health departments.  The CDC has published weekly reports on mercury exposure associated with beauty creams from Mexico for more than twenty years.  In 1996, state health departments of Texas, New Mexico, and California reported investigatory findings of mercury poisoning amongst persons who had used a beauty cream produced in Mexico.[22]  In 2010, the California Department of Public Health conducted epidemiologic and environmental investigations after a health study coordinator alerted the department about a Mexican-American family with elevated blood mercury levels. Upon finding that a Mexican beauty cream with mercury content over five percent by weight, the health department issued clinical health alerts notifying physicians about the potential cause of

---

[22] *See* Morbidity and Mortality Weekly Report (MMWR) 45(19); 400-403, *supra* n.6.

mercury toxicity.[23]   Most recently, the CDC issued a report discussing the first known case of contamination of skin lightening cream with methyl mercury, a highly-toxic organic mercury compound.[24]   This case is the most similar to the Pederson's condition and experience.

## STATEMENT OF FACTS

***Pederson's Continued Deterioration, Prolonged Sickness, Fortuitous Discovery, and Ongoing Recovery***

26.    Pederson is a small business owner as a fitness instructor, wife to a San Antonio physician, and mother to a son and daughter. Pederson is of Hispanic descent, and her mother and other family members live in Mexico.

27.    Starting around 2012, Pederson noticed a gradual deterioration in her general health. She maintained her healthy and active lifestyle as a fitness instructor but began to notice unusual symptoms. Those symptoms included prolonged headaches, memory loss, decreased energy, extreme fatigue, limb paresthesia, and anxiety. Her condition gradually worsened over time and she sought medical treatment. Her medical treatment included extensive neurological testing in July 2017, such as a brain MRI and multiple sclerosis testing.  That testing was all negative, however, and Pederson's physicians continued to be confounded by her condition.

28.    Then, after many months and years of prolonged suffering, Pederson tried to rest while watching a Spanish news segment on or about September 2019.  One particular story covered a very unfortunate woman in Southern California who became comatose as a result of using a facial cream from Mexico which contained mercury. When the news crew showed a picture of the

---

[23] *See* Morbidity and Mortality Weekly Report (MMWR) 61(02); 33-36, CENTER FOR DISEASE CONTROL & PREVENTION (Jan. 20, 2012), available at
https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6102a3.htm?s_cid=mm6102a3_w.
[24] *See* Morbidity and Mortality Weekly Report (MMWR) 68(50);1166-1167 (Dec. 20, 2019), CENTER FOR DISEASE CONTROL & PREVENTION (Jan. 20, 2012), available at
https://www.cdc.gov/mmwr/volumes/68/wr/mm6850a4.htm?s_cid=mm6850a4_w.

---

specific cosmetic product, Pederson recognized it immediately as the one she had been using for years. It was a small container of Pond's Rejuveness anti-aging cream.

29.     Pederson relayed the news story to her husband and they sent her container of Rejuveness for laboratory testing.  The testing confirmed it contained mercury and Pederson's physicians admitted her to the hospital for mercury poisoning treatment. Repeated blood testing demonstrated Pederson's blood had a concentration of one hundred and forty (140) parts per million. A normal range of mercury is zero, while eleven (11) parts per million is considered acutely toxic. What is more, in a recent case in California involving Rejuveness, a Mexican-American woman with levels of one hundred and sixty (160) parts per million was rendered "unable to verbalize or care for herself, requiring ongoing tube feeding for nutritional support" according to the CDC.[25]

30.     Following her diagnosis of mercury poisoning, Pederson began the very slow treatment process and has been reducing her blood mercury levels ever since.  As of this date, her blood levels are still above eleven (11) parts per million, but down to forty (40) parts per million. She still suffers from upper extremity weakness and other symptoms. Mercury treatment, especially at such levels as Pederson's, is a prolonged and slow process.

31.     Having identified her condition as mercury poisoning, Pederson and her husband relayed their story to the CDC.  The CDC assigned Pederson a case number and ultimately tested the container of Rejuveness she had been using. The CDC found that it contained mercury levels hundreds of thousands of times higher than allowed by applicable FDA regulations.

***The Cosmetic was a Toxic Poison with no Warnings or Disclosure of Known Dangers***

---

[25] Morbidity and Mortality Weekly Report (MMWR) 68(50);1166-1167 (Dec. 20, 2019), CENTER FOR DISEASE CONTROL & PREVENTION (Jan. 20, 2012), available at
https://www.cdc.gov/mmwr/volumes/68/wr/mm6850a4.htm?s_cid=mm6850a4_w.

32.     Pederson's container of Pond's Rejuveness indicated it was produced at a facility in Mexico which would be free from the FDA's anti-mercury regulations.

33.     The Pond's Rejuveness container did not disclose it contained mercury, nor did it provide any warnings against using it without an intact protective seal.   Unilever failed to adequately label its product.

34.     Unilever is actually aware of multiple cases where its products manufactured in Mexico have been formally found to contain mercury by U.S. authorities.[26]  Unilever, like many cosmetics manufacturers, knows of mercury's dubious use as a skin-bleaching agent. Unilever could actively use this knowledge to intentionally exploit lax regulations in countries outside the United States through the use of mercury in products manufactured outside the United States. Unilever's knowledge evinces additional reasons it should label and package its products to protect and warn against adulteration by third parties.

### CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this lawsuit on behalf of herself and all other persons similarly situated, as members of the putative class referenced herein above.

36.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rule of Civil Procedure.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and/or superiority requirements of those provisions.

37.     Numerosity/Impracticability of Joinder:  On information and belief, the members of the Class could number in at least the hundreds or thousands.  Pond's accounts for a substantial

---

[26] Health Alert: Mercury Poisoning Linked to Use of Skin-Lightening Creams From Mexico, CALIFORNIA DEP'T OF PUBLIC HEALTH (Aug. 2019), available at
https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/EHIB/CPE/CDPH%20Document%20Library/Mercury%20i
n%20Skin%20Creams_HealthAlert%202019.pdf (listing two Pond's products, including Pond's Rejuveness).

percentage of cosmetic cream beauty and cosmetic products in the United States, including Texas and other Southern border states.

38.    <u>Commonality and Predominance:</u>  There is a well-defined community of interest and common questions of law and fact which predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary from one Class member to another, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

      a)   Whether the defect constitutes a design defect;

      b)   Whether the defect constitutes a manufacturing defect;

      c)   Whether Defendants failed to warn its customers of mercury additives in its anti-aging cream;

      d)   Whether the members of the Class are entitled to relief as a result of Unilever's wrongdoing; and

      e)   Whether the members of the Class are entitled to injunctive relief.

39.    <u>Typicality of Claims:</u>  Plaintiff's claims are typical of the claims of the Class because Plaintiff and all putative class members were subjected to mercury due to the use of Defendants' product.  Plaintiff's claims arise from the same practice and course of conduct that gives rise to the claims of the putative class members and are based on the same legal theories. The only difference could be the amount of damages sustained, which can be readily determined and does not bar class certification.

40.    <u>Adequacy of Representation:</u>  Plaintiff is a representative who will fully and adequately protect the interests of the members of the putative class and has retained class counsel who are experienced and qualified in prosecuting class actions, including products liability actions

and other forms of complex litigation.   Neither Plaintiff nor her attorneys have contrary or conflicting interests with those of the Class.

41.   <u>Superiority/Manageability:</u>   A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.   The likelihood of individual Class members prosecuting separate claims is remote, and even if every Class member could afford individual litigation, the court system would be unduly burdened by the extensive individual litigation of such cases.   Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.   Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper.

## <u>COUNT I – STRICT LIABILITY</u>
### (By Plaintiff, the Class against all Defendants)

42.   Plaintiff incorporates all paragraphs of this Complaint and asserts a cause of action against Unilever for strict liability in tort.

43.   Under Section 402A of the Restatement (Second) of Torts, a seller of a defective product may be held strictly liable for any injury the product causes to a consumer.   Strict liability applies if the seller is engaged in the business of selling the product and if the product reaches the consumer without any substantial change.   RESTATEMENT (2D) TORTS § 402A(1).   A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, design defective, or is defective due to inadequate warnings or instructions.   RESTATEMENT (3D) TORTS:

PRODUCT LIABILITY § 2.  The special rule of strict liability has long been extended to cases involving cosmetics.  *See* RESTATEMENT (2D) TORTS § 402A, cmt. b.

44.    Pond's Rejuveness was unreasonably dangerous and defective at the time it was designed, manufactured, distributed, sold, and/or supplied because it contained mercury, or alternatively, was dangerously packaged.  At all times relevant to this cause of action, Defendant Unilever engaged in the business of designing, manufacturing, packaging, marketing, distributing, selling, maintaining, and/or supplying Pond's Rejuveness and placed it into the stream of commerce.  The defects in the anti-aging cream included defects in design, manufacture, packaging, instructions, and warnings.  The cream was in a defective condition at the time it left the control of Unilever and at the time it came into the control of the Plaintiff.  The defective condition of the anti-aging cream, which made it unreasonably dangerous for the use of the general public and the parties to this case, arose because of a miscarriage in the manufacturing process, and/or because of its design, and/or because of the failure to adequately warn or instruct the general public as to its use and operation concerning dangers of mercury adulteration.

45.    With respect to the design of the product, at the time the anti-aging cream left Unilever's control, there were safer alternative designs.  In reasonable probability, these alternative designs would have prevented or significantly reduced the risk of injury and damages sustained herein.  Furthermore, such safer alternative designs were economically and technologically feasible at the time the product left Unilever's control.  One such example of a safer alternative design is the inclusion of a safety or tamper-resistant seal and a warning/instruction, based on widely recognized adulteration dangers, to not use the product if the tamper-resistant seal was not intact.

46.     With respect to the manufacturing of the product, Pond's Rejuveness does not conform to its intended design and fails to perform safely as the intended design would have performed.  Whether Unilever manufactured the product to include mercury for its believed skin-bleaching effects or whether a third party is contaminating multiple containers of Pond's Rejuveness, Unilever failed to adequately package and label its product.  Unilever, like many cosmetics manufacturers, knows of mercury's dubious use as a skin-bleaching agent.  Unilever could actively use this knowledge to intentionally exploit lax regulations in countries outside the United States through the use of mercury in products manufactured outside the United States.  Alternatively, Unilever's knowledge evinces additional reasons it should label its products to protect and warn against such toxins.

47.     The Pond's Rejuveness container did not disclose it contained mercury, nor did it provide any warnings against using it without an intact protective seal.

48.     In the alternative, Plaintiff pleads under Mexican product liability law.  Each Mexican State has a Civil Code, which includes regulations regarding product liability and hidden defects, and there is a Federal Consumer Protection Law[27] that applies to all of Mexico.[28]  A supplier cannot limit or waive its liability, and dangerous products must have clear and visible warnings on the package and on the product, as well as instructions for its use.

49.     Unilever's prior knowledge of the common third party practice of product adulteration, or Unilever's intentional use of mercury, constitute acts of fraud, malice, and/or gross

---

[27] Ley Federal de Protección al Consumidor [LFPC], Diario Oficial de la Federación [DOF] 05-02-1976, available in English at https://www.profeco.gob.mx/juridico/pdf/l_lfpc_06062006_ingles.pdf (last accessed Jan. 2, 2020).
[28] Luis Fuentes Rodríguez and Habib Diaz Noriega, *Product liability and safety law in Mexico: overview*, THOMSON REUTERS PRACTICAL LAW (UK), available at https://uk.practicallaw.thomsonreuters.com/w-013-1811?transitionType=Default&contextData=(sc.Default)&firstPage=true&bhcp=1 (last accessed Jan. 2, 2020).

negligence such that Plaintiff and the putative class members are entitled to punitive and exemplary damages.

## COUNT II – NEGLIGENCE
### (By Plaintiff, the Class against all Defendants)

50.    Plaintiff incorporates all paragraphs of this Complaint and asserts a cause of action against Unilever for negligence.  Defendant Unilever and its agents, servants, and/or employees, for whose such acts Unilever is in all things responsible, were negligent in designing, manufacturing, marketing, maintaining, distributing, selling, and/or supplying the Class Product. Unilever engaged in certain acts and omissions constituting negligence, including but not limited to:

- Failing to properly design the Pond's Rejuveness container;

- Failing to properly manufacture Pond's Rejuveness in accordance with appropriate federal standards;

- Failing to properly market Pond's Rejuveness as a skin-lightening cream;

- Failing to adequately label the Pond's Rejuveness container to include mercury as an ingredient; and

- Failing to adequately warn consumers against mercury toxins.

51.    Pond's Rejuveness was unreasonably dangerous and defective at the time it was designed, manufactured, distributed, sold, and/or supplied.  At all times relevant to this cause of action, Defendant Unilever engaged in the business of designing, manufacturing, marketing, distributing, selling, maintaining, and/or supplying Pond's Rejuveness and placed the Pond's Rejuveness into the stream of commerce.  The defects in the anti-aging cream included defects in design, manufacture, instructions, packaging and warnings.  The cream was in a defective condition at the time it left the control of Unilever and at the time it came into the control of

Plaintiff.  The defective condition of the anti-aging cream, which made it unreasonably dangerous for the use of the general public and the parties to this case, arose because of a miscarriage in the manufacturing process, and/or because of its design, and/or because of the failure to adequately warn or instruct the general public as to its use and operation.

52.    With respect to the design of the product, at the time the anti-aging cream left Unilever's control, there were safer alternative designs.  In reasonable probability, these alternative designs would have prevented or significantly reduced the risk of injury and damages sustained herein.   Furthermore, such safer alternative designs were economically and technologically feasible at the time the product left Unilever's control.  One such example of a safer alternative design is the inclusion of a safety or tamper-resistant seal.

53.    With respect to the manufacturing of the product, Pond's Rejuveness does not conform to its intended design and fails to perform safely as the intended design would have performed.  Whether Unilever manufactured the product to include mercury for its believed skin-bleaching effects or whether a third party is contaminating multiple containers of Pond's Rejuveness, Unilever failed to adequately label its product.   Unilever, like many cosmetics manufacturers, knows of mercury's dubious use as a skin-bleaching agent.  Unilever could actively use this knowledge to intentionally exploit lax regulations in countries outside the United States through the use of mercury in products manufactured outside the United States.

54.    The Pond's Rejuveness container did not disclose it contained mercury, nor did it provide any warnings against using it without an intact protective seal.  Alternatively, Unilever's knowledge evinces additional reasons it should label its products to protect and warn against such toxins.

55.     These acts of negligence, among others, were the direct and proximate cause of Plaintiff's injuries.

56.     In the alternative, Plaintiff pleads facts under Mexican product liability law.  In Mexico, the only requirement to establish liability is proof of purchase.  In addition to the Federal Consumer Protection Law, the Federal Civil Code states that a manufacturer who acts illegally or against good custom is obligated to repair the injury, unless the manufacturer can show contributory negligence.[29]

57.     Unilever's prior knowledge of the common third party practice of product adulteration, or Unilever's intentional use of mercury, constitute acts of heightened culpability such that Plaintiff and the putative class members are entitled to punitive and exemplary damages. When viewed objectively from Unilever's standpoint, its actual knowledge of the foregoing facts involved such a degree of risk, considering the probability and magnitude of potential harm to others, that it Unilever's conduct constituted gross negligence. Unilever proceeded to manufacture, package, market, and sell Pond's Rejuveness with conscious indifference to the rights or welfare of consumers

## JURY DEMAND

Plaintiff hereby demands, individually and on behalf of the putative class members a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Janneth Pederson, individually and as representative of all others similarly situated, respectfully requests that this Court enter judgment as follows:

---

[29] Código Civil [CC], cap. V, art. 1910, Diario Oficial de la Federación [DOF] 14-05-1928, available at http://www.diputados.gob.mx/LeyesBiblio/pdf/2_030619.pdf (last accessed Jan. 2, 2020).

1)  Declaring that this action is properly maintainable as a class action and certifying Janneth Pederson as Class Representative;

2) Awarding damages to Pederson and the other Class members, including but not limited to:

   a)  Past and future medical expenses;

   b)  Past and future pain and suffering;

   c)  Past and future physical impairment;

   d)  Past and future mental anguish; and

   e)  Past and future loss of earnings;

3) Awarding Pederson and the Class compensatory and punitive damages as a result of Defendants' violations and enjoining the Defendants from continuing their illegal practices set out above;

4) Requiring Unilever to inform the public of the defect(s) possessed by Pond's Rejuveness purchased, acquired, and/or manufactured in Mexico;

5) Pre- and post-judgment interest;

6) Attorneys' fees and other costs of court; and

7) Providing such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**McCathern, PLLC**

/s/ Justin N. Bryan
Arnold Shokouhi
State Bar No. 24056315
arnolds@mccathernlaw.com
Justin N. Bryan
State Bar No. 24072006
jbryan@mccathernlaw.com
Kristin M. Hecker
State Bar No. 24116499
*Pro hac vice*
*District Admission Pending*
khecker@mccathernlaw.com
3710 Rawlins Street, Suite 1600
Dallas, Texas 75219
Telephone: (214) 741-2662
Facsimile: (214) 741-1741

Evan Selik
*Pro hac vice*
California Bar No. 251039
eselik@mccathernlaw.com
523 West Sixth Street, Suite 830
Los Angeles, California 90014
Telephone: (213) 225-6150
Facsimile: (213) 225-6151

**ATTORNEYS FOR JANNETH PEDERSON**